(A.R.D. 236)

United States *v.* H & S Originals

Entry No. 764181, etc.

## Second Division, Appellate Term

(Decided March 21, 1968)

*Edwin L. Weisl, Jr.*, Assistant Attorney General (*Glenn E. Harris*, trial attorney), for the appellant.

*Barnes, Richardson & Colburn* (*Norman C. Schwartz* of counsel) for the appellee.

Before RICHARDSON, LANDIS, and BECKWORTH, Judges

RICHARDSON, Judge: This application for review was filed by the Government, seeking a review of the decision and judgment of the trial court sitting in reappraisement in *H & S Originals* v. *United States*, 57 Cust. Ct. 704, R.D. 11244, and holding that export value as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956), and represented by the values contended for by the importer-appellee, is the proper dutiable value of various items of beads and costume jewelry exported from Japan between October 31, 1961, and April 14, 1964. No question

is presented as to the proper basis of value or as to the basic unit of value which in the involved cases is the manufacturers' ex-factory prices. At issue here is the propriety of certain percentage additions returned by the appraiser in advancing these prices, which additions range from a low of 1.3 percent to a high of 27⁄8 percent, packed, in the 76 consolidated appeals covered by this application for review.*

It is contended by appellant, among other things, that these percentage additions were properly made to reflect actual market value. It is appellee's position that the additions were improperly made because they reflect a portion of the non-dutiable buying commission and inland charges. The trial court agreed with appellee's view and reappraised on the basis of the ex-factory prices. Said the trial court in its opinion:

The defendant contends that plaintiff has not met its burden of proof and asserts that the real issue is whether plaintiff's claimed "exfactory" prices or the appraised value represent the correct export value. The Government further argues that the plaintiff's reliance upon the rule of severability is "entirely misplaced." This latter contention the court deems to be without merit and it will not be further discussed, the court being convinced that the cases on the point hereinbefore cited are dispositive of this issue.

The evidence, documentary and oral, in this case clearly supports the claim of the plaintiff that 8 percent buying commission was paid by the importer and that only part of the commissions paid were deducted in arriving at the appraised values. . . .

\*        \*        \*        \*        \*        \*        \*

The reports (defendant's exhibits A and B) and the affidavit (exhibit C) are not in the opinion of the court of such weight as to affect the factual situation based on the testimony introduced by the plaintiff.

\*        \*        \*        \*        \*        \*        \*

The probative evidence of record is sufficient to overcome the statutory presumptive correctness ordinarily attaching to the values found by the appraiser. 28 U.S. Code, section 2633. The plaintiff has presented competent and persuasive evidence making out a *prima facie* case which successfully challenges the appraiser's finding of value made on the basis of invoiced unit prices, plus a varied percentage in each case under a formula recommended by the line examiner which allows only 7 percent of the full f.o.b. invoiced cost, *thus allowing some but not all* of the invoiced 8 percent buying commission or of the invoiced other inland charges. The varied percentage additions being arbitrarily made, and without justification, have the effect of leaving the invoice unit price of each item in each entry as the correct export

---

*It should be noted that appellant does advance the argument that the appraisements herein are not "separable," and that as such appellee may not limit its challenge merely to the item or items added to the basic unit of value by the appraiser. This contention was summarily rejected by the trial court. And in the light of the recent decision by our appeals court in *United States* v. *Chadwick-Miller Importers, Inc., et al.,* 54 CCPA 93, C.A.D. 914, as to the applicability of the "separability rule" it would seem that enlargement of the scope of judicial inquiry here is foreclosed.

value by reason of the successful challenge to said varied percentage additions. As the appraisement in each case is erroneous, and as the importer established a different value in place thereof, it was incumbent upon defendant to prove that the appraised value in each case is correct and proper. Evidence introduced by defendant does not support the appraised value. * * *

The foregoing conclusions and findings of the court below are before us by virtue of numerous assignments of error advanced by appellant, which require us to ascertain whether the conclusions and findings are supported by any substantial evidence in the record.

The record below consisted of the testimony of appellee's import manager, Henry Falkenstein, and the line examiner Joel Margulies, three affidavits, two foreign reports of a customs appraiser and numerous other documents. Most of the testimony of the first witness whom plaintiff called, Mr. Falkenstein, dealt on direct examination with the identification and authentication of the documentation supporting what is said to be a representative number of the involved transactions and which documentation (plaintiff's exhibits 2 through 20) was received in evidence over appellant's objections. The salient feature of this documentation is that the endorsements or countersignatures of the manufacturers of the involved merchandise appear to have been made on the Acceptance Notes or Sales Notes given by the buying agent to the importer in confirmation of the basic buying prices or ex-factory prices expressed in U.S. dollars. And these same prices are set forth in the invoices given the importer by its buying agent.

On the Government's cross examination of Mr. Falkenstein, the witness testified (R.67–69):

Q. I am asking you did you participate personally in the negotiation for the purchase of any of the items in the appeals for reappraisement before this Court today.—A. No, sir.

Q. Then you have no personal knowledge as to what the negotiation was.—A. Of course, in effect, if these orders were placed by cable and written form to Japan.

Q. No, I am speaking now of an agreement arrived at face to face with the maker by your company.—A. I have not.

 * * * * * * *

Q. Now disregarding any statements, Mr. Falkenstein, on documents which you have received and which you have handled, do you have any personal knowledge as to where any of this merchandise before the Court was delivered by the maker?—A. I have no personal knowledge.

Q. Do you have any personal knowledge as to what expense was actually incurred in Japan for the inland transportation or insurance of any of the merchandise before the Court—personal knowledge in the same sense?—A. No, I could not, no.

The explanation of the method of appraisement adopted in these cases is contained in the testimony of Mr. Margulies, excerpts from which were quoted in the trial court's opinion on page 708. In addition to the testimony singled out by the trial court, Mr. Margulies, having been called as a witness on behalf of the importer, testified on cross examination conducted by Government counsel that he recommended that the appraiser not accept the alleged ex-factory prices appearing on the invoices as representing the appraised value, that the appraiser find that the charges shown on the invoices not to be the correct amounts for inland charges, haulage, lighterage, etc., that the amounts set forth on the invoices for commissions not be accepted as the necessarily correct amounts for buying commissions. In this connection, Mr. Margulies further testified (R. 115–116):

Q. In what respect, and for what considerations did you so recommend?—A. For the considerations that it was my opinion that the invoiced prices, as representing ex-factory prices, were not the accurate prices paid to the manufacturers, or manufacturers' sellers on the invoices.

Q. Did you duly find or conclude that there was a buying commission paid to the Sanyei Corporation, or its predecessor?—A. Yes. I concluded that there was a buying commission paid.

Q. But did you conclude it was in the amount stated on the various invoices?—A. Not necessarily in those amounts.

Q. Did you conclude that there were inland charges incurred, which were incurred after the point of delivery by the seller, in respect to this merchandise?—A. Yes, I did.

Q. Did you conclude that those inland charges were in the amounts alleged on the invoices?—A. I concluded they were not in those amounts.

Q. What were your various advisory notations or appraisements which tended to indicate that?—A. The appraisements as made were intended to indicate what the freely offered price of the actual manufacturer or seller was.

Q. Did the Appraiser or the Assistant Appraiser accept and approve the amounts of your advisory classification, or advisory appraisement?—A. They did.

And on redirect examination Mr. Margulies testified (R. 117–118):

Q. Simply stated, Mr. Margulies, is it true that——

JUDGE WILSON: May I ask just one question? Did you make any deductions in arriving at your recommendations of the value to be fixed; or a reduction for commission paid, or for inland freight charges; or did you include everything in your appraised value?

THE WITNESS: Actually, my appraised value represented the invoice unit values, plus an addition, and that addition, plus the invoiced unit price, to me represented the full freely offered price of the manufacturer.

JUDGE WILSON: You said, in your answer to Mr. Harris, that you did determine there was a buying commission paid, but not necessarily in the amount shown, and that there were some inland freight charges incurred after the merchandise had been moved. Did you make deductions in your recommendations for those items?

THE WITNESS: I made allowances for them, but not a deduction, since the unit was a net unit, ex-factory, as stated on the invoice.

JUDGE WILSON: Did you make an allowance for them?

THE WITNESS: Yes, I did, your Honor.

JUDGE WILSON: How?

THE WITNESS: The full FOB amount shown on the invoice was a much higher amount than my appraised value, and the difference between my appraised value, and the amounts shown for commission and inland charges resulting in a full FOB amount, that difference was what I allowed for commission and inland charges.

And on recross examination, Mr. Margulies testified (R. 121–122):

Q. Mr. Margulies, did H&S, the importer in these various appeals ever present any detailed information to you on any of these appeals for reappraisement, showing the actual purchase price from the factory, the actual amount remitted to the seller of the merchandise?—A. My recollection is that the only thing submitted to me were copies of orders or confirmations which agreed with the amounts shown on the invoices.

Q. Now, the amounts on the invoices, were they in the currency of purchase?—A. They were not.

Q. Did you have other information, then, upon which you concluded that these were not accurate?—A. Yes. * * *

    \*     \*     \*     \*     \*     \*     \*

Q. Will you explain your affirmative answer, Mr. Margulies?— A. Yes. My knowledge is that the currency of the purchase from these manufacturers is always in yen, rather than in dollars.

    \*     \*     \*     \*     \*     \*     \*

Q. Was your advisory appraisement intended to include, or to reflect the purchase price of the merchandise on a delivered basis, or delivered to the shipper's warehouse in Osaka?—A. Yes.

    \*     \*     \*     \*     \*     \*     \*

Q. Let me rephrase that. Did you attempt, after making this determination as to what the delivered price was, to determine what additional charges might have been incurred for inland freight beyond that point, or did you feel it necessary to make such determination?— A. After my determination, it was not necessary.

Q. Did you attempt, after this point, to make any determination as to the exact amount of the buyer's commission?—A. Beyond this point it was not necessary, in my opinion.

JUDGE WILSON: Then you didn't? Your answer is "no"?

THE WITNESS: No.

The foregoing constitutes the "testimonial" evidence in the record bearing on the matter of the percentage additions to the unit prices. Pertinent also in this connection are numerous documents received in evidence upon the trial. Included here are the two affidavits of Hiroshi Watanabe, Sanyei's managing director, dated November 2, 1964, and May 6, 1965, respectively. (Plaintiff's exhibits 22 and 23.) The contents of these affidavits were set forth at length in the opinion of the trial court and need not be repeated here. Noteworthy on the issue before us is the fact that in his first affidavit Watanabe states that the buying agent picked up the merchandise in question at the factories, caused it to be shipped to the various outgoing vessels, and paid the various inland transportation and storage charges (incurred in moving the merchandise from the factory to the vessel); and in the second affidavit Watanabe states that the buying agent most often received the involved merchandise from the sellers at the agent's warehouse in Osaka, that the sellers' prices included transportation and insurance, if any, from factory to the agent's warehouse in Osaka, and that the agent paid, subject to reimbursement, freight, any storage, insurance, and hauling and lighterage charges from the agent's warehouse to the vessel.

Also in evidence as plaintiff's exhibit 1 is the buying agency agreement concluded between the importer and Sanyei on October 10, 1961, and signed by George Herzig, president of the importer firm and Kunio Izumi, president of Sanyei. Noteworthy among its provisions from the standpoint of the issue here as to charges accruing after "ex-factory" are the following provisions:

A)   Sanyei Corp. will act as agent and shipper on behalf of H. & S. Originals Inc. and will place orders on behalf of H. & S. Originals Inc. with various makers at ex-factory prices only.

B)   H. & S. Originals Inc. agrees to pay eight percent (8%) buying commission to Sanyei Corp. based on the ex-factory prices.

C)   H. & S. Originals Inc. will also pay actual shipping charges to the steamship lines or airlines and will reimburse Sanyei Corp. for all inland freight charges to shipping port, storage charges, Insurance premium charges to on board, hauling and lighterage charges that occur on each and every shipment of merchandise.

On behalf of the Government an affidavit of Sanyei's president, Kunio Izumi (defendant's exhibit C) and two foreign reports of U.S. Appraiser Frank W. Hammar (defendant's exhibits A and B) were received in evidence.

The affidavit of Sanyei's president, Mr. Izumi (exhibit C), dated March 29, 1962, states in relevant part:

1.   Completed imitation pearl costume jewelry is purchased from various manufacturers in Japan at prices which are negotiated at the time

of order placement and which include the full cost of all materials and labor required for completion of the individual articles, the manufacturers' profit, delivery to the Kyoei Boeki Co., Inc., Osaka Warehouse, export case and packing, and the Japanese Government's required quality inspection fees, although none of such costs and expenses are ever separately itemized by manufacturers nor are they separately identifiable in price negotiations or final billing by the manufacturer;

2. Kyoei Boeki Co., Inc., does not further process such imitation pearl costume jewelry in any way prior to its shipment to the United States, but the firm does accrue additional expenses in the form of freight forwarders' charges to on board, such as Japanese customs export clearance fees, marking of cases, loading on board and other minor charges, and also, insurance to on board and occasionally storage charges;

3. Kyoei Boeki Co., Inc., separately negotiates with United States importers ex-factory prices, such ex-factory prices being the only prices known to United States importers and which prices may or may not be the same as the delivered prices negotiated with manufacturers;

4. Manufacturers of this merchandise are occasionally provided promissory notes by Kyoei Boeki Co., Inc., as advance payments or guarantees, in connection with orders placed, but seldom cash advances;

The foreign reports dated March 30, 1962, reflect interviews conducted by Mr. Hammar with the owner and with the president of Shimada Pearl Kogyosho and Senshin Pearl Kogyo K.K., respectively, of Osaka, Japan, pertaining to contemporary export transactions covering merchandise such as that at bar which these Japanese manufacturers had with Criterian Bead & Novelty Corp. and H & S Originals Inc., respectively, of New York City. Among other things, each report purports to verify the yen prices of a particular transaction from the manufacturer's records. In the case of the Shimada Pearl interview (exhibit A) verification is taken from Kyoei Boeki's orders (placed with Shimada), and from Shimada's sales invoice (to Kyoei Bokei). In the case of the Senshin Pearl interview (exhibit B) verification is taken from Kyoei K.K. (not Nakanishi) order (placed with Senshin) and from an exhibit A annexed to Tokyo report No. 295 of April 4, 1962, regarding Nakanishi & Co. which has not been placed in evidence in this record. In both instances the yen prices verified are said to have included transportation to Osaka warehouse and insurance to godown, if any, in line with statements made to this effect in the body of the reports under the heading, "Price, Terms." In the report contained in exhibit B the interviewee, Minoru Kawai, repudiates the genuineness of his purported signature, "M. Kawai" which is countersigned on the Nakanishi sales note No. 995 of June 9, 1961, in plaintiff's exhibit 24. And a comparison of this disputed signature with the purportedly genuine countersignatures of M. Kawai on the Nakanishi

sales notes in plaintiff's exhibits 20 and 25 discloses the disputed signature to be at least different from the supposedly genuine signatures, insofar as we are concerned.

The foregoing constitutes the evidentiary record in these consolidated cases. We are of the opinion that the "testimonial" evidence in the record does not support appellee's contention as to dutiable value. Mr. Falkenstein, appellee's first witness, admittedly lacked personal knowledge of the details of the initial or primary level of transactions in Japan underlying the exportation of the merchandise at bar, or merchandise such as that at bar. And in the testimony of the line examiner Margulies, appellee's second witness, it is made clear that appraisement of the involved merchandise was undertaken with a view toward returning an export value based on a "delivered price" inclusive of inland charges to the point of delivery; and that the actual outlays incurred for inland charges and buying commissions became a casualty of the value finding process to the extent that the "delivered prices" returned by the appraiser overlapped the unit prices on which actual outlays for inland charges and buying commissions were calculated by the parties.

The record does not bear out any undertaking on the part of the appraiser, who adopted his line examiner's advisory appraisement, to include in the involved export values non-dutiable inland charges (charges subsequent to delivery) or a buying commission. And the evidence contained in the defendant's exhibits A, B, and C, if in fact these documents or any of them were relied upon by the appraiser (they were in existence at the time of the appraisements herein), tends to support the existence of a "delivered price" as opposed to an "ex-factory price" in the ordinary course of business. What the case comes down to, then, in view of evidence from all accounts that the Japanese manufacturers added to their prices their costs in moving the merchandise from the factory to the point of delivery, is whether the unit prices in dollars reflected in the invoices given at the secondary level of transactions in Japan (invoices covered by the involved appeals) are the same as the purchase prices in yen passing between the manufacturers and the buying agent at the primary level of transactions in Japan. If the comparative prices are not the same, then the action of the appraiser in adding charges to the first cost prices would seem to be correct and proper. And on the other hand, if the comparative prices are the same, then the appraiser's action would seem to be in error in adding anything to the unit prices. In this connection we think the trial court correctly admonished appellee that it had "a rather heavy burden" to establish each delivery in all these cases (R. 101). For it is presumed that the appraiser found that the comparative prices were not the same in each of the cases before us.

Looking again to the "documentary" evidence in the record we note that the buying agency agreement contained in exhibit 1 commits the buying agent Sanyei to a course of dealings with the Japanese manufacturers on an ex-factory price basis, and mandates such price basis as the standard for calculating commissions accruing thereunder to the agent, and this, irrespective of the actual basis upon which business was conducted and sales consummated. Viewed against this background the price confirmations containing the endorsements or counter-signatures of the Japanese manufacturers (exhibits 2 to 20), if they prove anything at all, indicate only the actual ex-factory prices which furnished the basis for the calculation of buying commissions. And inasmuch as the confirmations are in line with what the contract called for price-wise, we agree with the trial court's reception of the same in evidence along with the other documentation that accompanied them. Together these documents simply furnished the basis for the accrual of buying commissions on the involved entries, and are admissible for that purpose. We do not think, however, that they add anything to the proof of the components of a "delivered price" which we must ultimately find to exist or not to exist in the same amounts as the "ex-factory price" these documents reflect.

More to the point on the matter of the components of the "delivered price" are the affidavits received in evidence as plaintiff's exhibits 22 and 23 and defendant's exhibit C. Here we note that the tenor of paragraph 6 of exhibit 23 is that the "ex-factory price" and the "delivered price" is the same, while the tenor of paragraph 3 of exhibit C is that the "ex-factory price" and the "delivered price" "may or may not be the same."

The trial court did not give any weight to exhibit C or the foreign reports contained in exhibits A and B, and elected to credit the recitals of exhibit 23. While we recognize the prerogative of a trier of the facts in reappraisement proceedings to accept evidence contained in affidavits over that contained in foreign reports with respect to disputed issues of fact, nevertheless preferential treatment of the strata of evidence would not warrant giving no weight to exhibit C which, qualitatively speaking, is on a parity with exhibit 23 and which, on this essential matter, is at odds with exhibit 23. As between the two exhibits we are inclined to believe that exhibit C possesses greater probative value than exhibit 23. At the very least exhibit 23 is offered at the risk of exposing a contradiction on some points by the affiant over his former sworn statements in exhibit 22 on the matter of pricing policies of the Japanese manufacturers.

Furthermore, exhibit C emanates from Sanyei's president who professes to have had a hand in formulating the pricing arrangements of his company. On the other hand, exhibits 22 and 23 were executed

by Sanyei's managing director who does not aver personal participation in the pricing arrangements, but who predicates his knowledge of the situation solely upon his position with the company as managing director. Then too, we note that the distances of the Japanese factories from the place of delivery in the city of Osaka (as shown on the confirmations placed in evidence by the appellee) vary, with the factories being located both within and without the prefecture of Osaka. This situation, it seems to us, lends credence to the statement contained in exhibit C to the effect that the disputed prices may or may not be the same. It is quite conceivable to us that a quotation of an "ex-factory price" from a Japanese manufacturer whose plant is located in the same city where the buying agent's warehouse is located might be the same as a quotation of a "delivered price" emanating from the same manufacturer. However, it is quite another thing to suggest to us that a "delivered price" quotation from a manufacturer located in the suburbs of Osaka city or a more distant place from the warehouse where delivery is to be effected would be the same as its "ex-factory price." In any case, we are of the opinion that the probative value of exhibit 23, if not cancelled out by contradictory statements in exhibit 22, is outweighed by conflicting statements in exhibit C stemming from the same general source. And our view as to the lack of probative value of exhibit 23 leaves the record devoid of any "documentary" evidence tending to rebut the presumption attaching to the appraisements herein.

For the reasons stated, we conclude on the basis of the record as a whole that there is no substantial evidence before us to support the findings and conclusions of the trial court. Accordingly, we find as facts:

1. That the merchandise covered by the involved reappraisement appeals consists of beads and costume jewelry which were exported from Japan between October 31, 1961, and April 14, 1964, and appraised upon entry on the basis of export value as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) at invoice unit prices plus varying percentage additions ranging from a low of 1.3 percent to a high of 27⅞ percent, packed.

2. That the appraisements herein are "separable" and the only item challenged by the importer in each of the involved appeals is the percentage addition made by the appraiser in each of said appeals.

3. That upon the trial herein the importer adduced no competent, persuasive or substantial evidence that said percentage additions included a buying commission or part thereof, or any non-dutiable inland charges.

We conclude as matters of law:

1. That the evidence in the record fails to rebut the presumption of correctness attaching to the appraisements herein.

2. That export value as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) is the proper basis for determination of the value of the merchandise covered by the involved reappraisement appeals.

3. That such export value is represented herein by the appraised values.

The judgment of the trial court is reversed, and judgment will be entered herein accordingly.